**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| OCÉ NORTH AMERICA, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 C 2381 |
| v. ) | |
| ) | Judge Ronald A. Guzmán |
| ANDRE BRAZEAU, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff has sued defendant for breaching a non-competition agreement and using its confidential information in violation of the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 et seq. Plaintiff moved for a preliminary injunction on its claims, which the Court referred to Magistrate Judge Cox for a Report and Recommendation ("R&R"). Both parties filed objections to the R&R, all of which the Court overrules.

**Background**

Plaintiff, which sells printing equipment and services, has three business divisions: (1) Document Printing Systems ("DPS"), which markets standard printers and scanners; (2) Production Printing Systems ("PPS"), which markets high-volume printers; and (3) Wide Format Printing Systems ("WFPS"), which markets printers and scanners for over-sized documents. (First Am. Compl. ¶¶ 5-6.) Defendant was plaintiff's PPS Central Regional Sales Director from 1996 through 2001. (*Id.* ¶ 8; Def.'s App. Exs. Supp. Mem. Law Opp'n Mot. Prelim. Inj., Brazeau Aff. ["Brazeau Aff."] ¶ 2; Mot. Prelim. Inj., Sundberg Decl. ["Sundberg Decl."] ¶ 7.) In 2001, he became Central

Regional Sales Manager for IBM Printing Systems, one of plaintiff's competitors in the PPS market. (First Am. Compl. ¶ 8; Brazeau Aff. ¶ 3.)

In 2005, defendant returned to work for plaintiff as Vice President of Sales for the WFPS unit. (First Am. Compl. ¶ 9; Brazeau Aff. ¶ 5; Sundberg Decl. ¶ 8.) In that role, he had access to confidential information about plaintiff's sales strategies and business development plans through its Oasis database and cross-division selling program. (Brazeau Aff. ¶¶ 13-27; Sundberg Dec. ¶ 12.)

On August 10, 2005, the parties entered into an agreement that requires defendant to maintain the confidentiality of plaintiff's information and not to compete with plaintiff for a year after his employment ends. (*See* First Am. Compl, Ex. A, 2005 Agreement ¶¶ 5, 10 .) In January 2007, the parties entered into a second agreement that does not specifically prohibit defendant from disclosing plaintiff's confidential information but contains a broad non-compete clause purportedly designed to protect plaintiff's confidential information, customer relationships and goodwill. (*Id.*, Ex. B, 2007 Agreement ¶ 2.)

In February 2009, defendant left Océ to work for InfoPrint, a joint venture of IBM Printing Systems and Ricoh. (Answer First Am. Compl. ¶¶ 47-48; Brazeau Aff. ¶ 32.) Defendant's primary responsibility at InfoPrint, which sells PPS equipment and services, is to manage its sales strategy. (*Id.*) Plaintiff contends that defendant cannot work in this capacity for InfoPrint without violating the non-competition agreement or disclosing plaintiff's confidential information.

## **Discussion**

The Court reviews de novo the portions of the R&R to which the parties object. 28 U.S.C. § 636(b)(1)(A). The first objection, lodged by plaintiff, is to Judge Cox's ruling that the 2007

2

agreement controls the parties' dispute. (*See* R&R at 13-14.) Judge Cox said the ruling was compelled by the record, which showed that plaintiff told defendant the 2007 agreement controlled, and the doctrine of unilateral mistake. (*Id.* at 14 (citing Restatement (Second) of Contracts § 153 (stating that a contract is voidable if one party causes the other to make a mistake about a basic assumption underlying it)).)

The Court agrees with that conclusion, for a different reason: merger. Under Illinois law, "[a] complete, valid, written contract merges and supersedes all prior and contemporaneous negotiations and agreements dealing with the same subject matter." *Courtois v. Millard*, 529 N.E.2d 77, 79 (Ill. App. Ct. 1988); *see Ogle v. Hotto*, 652 N.E.2d 815, 819 (Ill. App. Ct. 1995) (same). The 2005 and 2007 agreements both address defendant's post-employment obligations, but they do so differently. The 2005 agreement bars defendant from disclosing plaintiff's confidential information and from selling competitors' products in a specified area for a year after his employment with plaintiff ends. (First Am. Compl., Ex. A, 2005 Agreement ¶¶ 5, 10.) The 2007 agreement does not expressly require defendant to maintain the confidentiality of plaintiff's information but has an expansive non-competition clause, "to protect the confidentiality of [plaintiff's] Confidential Information, . . . valuable customer relationships and goodwill." (*Id.*, Ex. B, 2007 Agreement ¶ 2.) Because the two agreements address the same subject matter, the 2007 agreement supersedes the 2005 agreement as a matter of law. *Courtois*, 529 N.E.2d at 79.

Judge Cox also ruled that paragraph 2(b), rather than 2(a), of the 2007 agreement applies, a conclusion to which defendant objects. In relevant part, that paragraph states:

> . . . Employee covenants and promises that during his or her employment with the Company and for one (1) year after Employee's employment by the Company ends . . . , that:

> (a) if Employee was employed in a sales capacity by Company, Employee shall not directly or indirectly become associated with, through ownership, employment, self-employment, consultancy, contract or otherwise, any "Competing Business" (which term shall mean any person, corporation, or other entity which designs, develops, manufactures, markets, sells or services any product or service which is the same as or similar to products or services which the Company designed, developed, manufactured, marketed, sold or serviced within the last twelve (12) months prior to the end of Employee's employment with the Company, including but not limited to, printing, copying, multifunctional and/or facsimile equipment and/or sales of related supplies) and approach, solicit or accept business from any of the Company's then-existing customers or identified prospective customers (i) within Employee's assigned area of responsibility, or (ii) within the area of responsibility of sales representatives for whom Employee had management responsibility or (iii) that Employee approached, solicited, or accepted business from on behalf of the Company. Furthermore, Employee shall not aid or assist any other person to do any of the above. The territory set forth in i, ii, and iii shall be determined by the then existing customers and identified prospective customers of the Company within the one year period preceding Employee's separation from the Company; and/or
>
> (b) if Employee was employed by Company in a capacity other than sales or service, such as, but not limited to, an employee subject to the Company's incentive and/or bonus plan, Employee shall not directly or indirectly become associated with, through ownership, employment, self-employment, consultancy, contract or otherwise, any Competing Business. Employee recognizes that the geographic locations within which the Company does business, trades and/or markets its products and services is nationwide, that Employee's work for the Company is national in scope and agrees that it is reasonably necessary for the legitimate protection of the Company's customer relationships and goodwill and Company Confidential Information that the scope of this restriction be nationwide; . . . .

(First Am. Compl., Ex. B, 2007 Agreement ¶ 2.) The plain language of subparagraph b defines employees "employed in a capacity other than sales or service" as, among others, those who are "subject to the Company's incentive and/or bonus plan." There is no dispute that plaintiff was subject to the incentive plan when he signed the 2007 agreement. (*See* 7/8/09 Hr'g Tr. at 20, 114.) Thus, the Court agrees with Judge Cox that paragraph 2(b) applies.

To obtain a preliminary injunction, plaintiff must show that it has a likelihood of success on the merits of its claims, it has no adequate remedy at law and will suffer irreparable harm if an

injunction is not issued, and its injury outweighs any injury an injunction may inflict on defendant. *Foodcom Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). To succeed on either its contract or trade secrets claim, plaintiff must prove that it has protectable confidential information and defendant has used or will use it for InfoPrint's benefit. *See Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999) (stating that a restrictive covenant is enforceable to protect the confidentiality of trade secrets an employee acquires from one employer and tries to use for another); *Pepsico, Inc., v. Redmond*, 54 F.3d 1262, 1267-68 & n.5 (7th Cir. 1995) (noting that an ITSA claim requires proof that plaintiff has a trade secret, *i.e.*, "important confidential business information," and defendant misappropriated it (quotation omitted)). Judge Cox found that plaintiff had confidential information in its Oasis and cross-selling databases and that defendant had access to both. (R&R at 17-20.) But she also said there was little evidence to suggest that defendant had used or would use any of plaintiff's information on behalf of InfoPrint.

Plaintiff believes the latter finding is contradicted by, among other things, two of defendant's InfoPrint emails. The first is defendant's response to a report that InfoPrint could lose its U.S. Bank account to "either Oce or Xerox." (*See* Def.'s Supplemental App. Exs. In Camera Review Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. 3, Email from McGinnis to Brazeau of 3/6/09.) It says: "Please pay particular attention to this customer specifically Greg Remter. I know for a fact that Oce is very active in this account and are just waiting for an opportunity to get some traction with Greg." (Cooperman Aff., Ex. 60, Email from Brazeau to Weir of 3/18/09.) In plaintiff's view, this email reference to Océ shows that defendant used its confidential information for InfoPrint.

The Court disagrees for several reasons. First, the email chain about U.S. Bank shows that defendant was responding to, not making, the assertion that Océ was a threat to that account. (*Id.*)

5

Second, the record shows that U.S. Bank was an InfoPrint customer before defendant started work there and contains no evidence that plaintiff had or sought a relationship with U.S. Bank when defendant was in its employ. (Cooperman Supplemental Decl., Ex. A, InfoPrint Financial Documents at IPS16851; *id.*, Ex. D, PPS Top 40 Active Sales Cycles; Cooperman Aff., Ex. 38 PPS Top 40 Active Sales Cycles.) Third, defendant testified that he did not obtain any information about U.S. Bank from plaintiff or give any information about it to InfoPrint, testimony that is corroborated by the InfoPrint sales representative for the U.S. Bank account. (Def.'s Supplemental App. Exs. Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. N, Brazeau Supplemental Aff. ["Brazeau Supplemental Aff."] ¶¶ 23-29; *id.*, Ex. R, McGinnis Aff. ¶¶ 3-8.) Accordingly, viewed in context, defendant's email does not suggest that plaintiff had or defendant misappropriated confidential information about U.S. Bank.

> The second email is defendant's response to this message from InfoPrint's CEO:
>
> I noticed that your team is trying to sell an IP5000 to Wachovia, and while I would like to see that happen, I think we are making a mistake and competition will force us to back-peddle. Instead, I think we should go into Wachovia demonstrating our understanding of their financial constraints and as a result, demonstrate our own readiness to make a financial sacrifice by proposing an IP5000 on SIP and thus help through difficult financial period. This is what "setting the agenda" is about. Otherwise, Kodak and others will offer a trial and we will be forced to back-peddle with a "me too" offer. This has the potential of an instant SYMCOR reply. Please get involved and make your team offer a SIP IP5000.

(Cooperman Aff., Ex. 61, Email to Brazeau from Romero of 3/25/09.) It says: "Let me run with this. Wachovia is an Oce account and I know that their color volume is limited and will need time to grow so a SIP would make sense from that view point." (*Id.*, Email to Romero from Brazeau of 3/25/09.) Again, plaintiff contends that defendant's references to Wachovia and Océ indicate misappropriation.

6

Again, the Court disagrees. To start, the record does not establish that Wachovia was an Océ PPS customer when defendant worked there. To prove this point, plaintiff submitted two documents entitled "Top 40 PPS Sales Cycles," which, though they are visibly different, plaintiff says are both copies of a single document it found on plaintiff's computer. (*See* Cooperman Aff. ¶¶ 2-3 (stating that Exhibit 38 is the PPS sales cycle document "found on Andre Brazeau's external hard drive"); *id.*, Ex. 38, PPS Top 40 Active Sales Cycles, OCE0009687-706; Supplemental Mem. Law Supp. Mot. Prelim. Inj. at 5; Cooperman Supplemental Decl. ¶ 5 (stating that Exhibit D, OCE0026241-67, is a copy of the "PPS sales cycle document . . . located on the external hard drive for the laptop Brazeau used while at Océ"); *id.*, Ex. D, PPS Top 40 Active Sales Cycles, OCE0026241-67). One of the documents lists Wachovia as an Océ customer, the other does not. (*Compare* Cooperman Supplemental Decl., Ex. D at OCE0009687, *with* Cooperman Aff., Ex. 38.) Moreover, even if Wachovia were an Océ customer at the relevant time, there is no evidence that Brazeau accessed or was exposed to any information about it from plaintiff's Oasis database, its cross-selling program or otherwise. (*See* Cooperman Aff., Ex. 24, Cross Selling Program DPS Guest Rep Tracking Report; *id.*, Ex. 25, Cross Selling Program WFPS Guest Rep Tracking Report; *id.*, Ex. 30, Cross-Selling Program Spreadsheet & Cross Selling Program WFPS Guest Rep Tracking Report; *id.*, Ex. 34, Cross Divisional Introductions August 2008 Activity Summary; *id.*, Ex. 36, Cross Selling Program Spreadsheet; *id.*, Ex. 41, June 16, 2008 Staff Meeting Agenda; *id.*, Ex. 42, February 21, 2008 Staff Meeting Agenda.) Further, there is unrefuted evidence that Wachovia was an InfoPrint customer before defendant worked there, and corroborated testimony from defendant that he did not obtain from plaintiff or give to InfoPrint any information about Wachovia. (Def.'s Supplemental Exs. In Camera Review Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. 6, Email

from Romero to Brazeau of 2/15/09; Def.'s Supplemental App. Exs. Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. S, McMahon Aff. ¶¶ 2-5; Brazeau Supplemental Aff. ¶¶ 37-41.) Thus, defendant's Wachovia email does not suggest that he misappropriated information from plaintiff.

As plaintiff points out, there is evidence that, soon after he joined InfoPrint, defendant communicated with or about TSYS, AFLAC, Symcor/Suntrust, Vanguard, Bank of America, Broadridge, Farmers Insurance and State Farm, all of which were plaintiff's PPS customers. (*See* Cooperman Aff., Ex. 72, InfoPrint's Communications with Océ Customers; *id.*, Ex. 38 PPS Top 40 Active Sales Cycles at OCE0009687, 707, 725, 731, 749, 767, 776; *id.*, Ex. 36, OCE206447; *id.*, Ex. 81, Emails between Kee and Oles of 3/18/09; Def.'s Supplemental Exs. In Camera Review Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. 5, Emails between Bartolacci and Brazeau of 3/9/09 & 3/10/09; Brazeau Supplemental Aff. ¶¶ 22, 42-46, 56-60.) But the record also shows that: (1) Broadridge, Bank of America, Symcor/Suntrust, TSYS, State Farm and Farmers were also InfoPrint customers and had been before defendant worked there; (2) defendant had established his own connections with Broadridge, Symcor/Suntrust, TSYS, State Farm and Vanguard years earlier when he worked for IBM; (3) InfoPrint had been actively soliciting Vanguard's business for years before defendant worked there; (4) State Farm had issued a request for proposal to InfoPrint before defendant started work there; (5) InfoPrint told defendant about Océ's contacts with Vanguard, Bank of America, Broadridge, Farmers and State Farm, not the reverse; and (6) defendant's only contact with AFLAC, which is primarily a Xerox customer, was making a "courtesy call" on the company with an InfoPrint sales representative. (*See* Cooperman Aff., Ex. 59, Email from Kimicata to Brazeau of 2/27/09; *id.*, Ex. 62, Email from Black to Brazeau of 4/20/09 & Symcor Colour Debrief

8

Attachment; *id.*, Ex. 81, Email from Kilcullen to Brazeau of 3/18/09; Cooperman Supplemental Decl., Ex. A, InfoPrint Financial Spreadsheet at IPS16847; Def.'s Supplemental Exs. In Camera Review Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. 5, Emails between Bartolacci and Brazeau of 3/9/09 and 3/10/09; *id.*, Ex. 6, Email from Romero to Brazeau of 2/15/09; Brazeau Supplemental Aff. ¶¶ 18-22, 30-35, 43-63; Def.'s Supplemental App. Exs. Supp. Supplemental Br. Opp'n Mot. Prelim. Inj., Ex. Q, Black Aff. ¶¶ 3-8; *id.*, Ex. S, McMahon Aff. ¶¶ 2-5; *id.*, Ex. T, Cosgrove Aff. ¶¶ 2-5; Brazeau Supplemental Aff. ¶ 46.) This evidence, and defendant's testimony that he learned nothing about these companies from plaintiff and said nothing about them to InfoPrint (Brazeau Supplemental Aff. ¶¶ 19, 31, 37, 43, 48, 53, 57, 62), vitiates any inference of misappropriation that might arise from these communications.

Plaintiff also argues that defendant's possession of some of its confidential documents after he resigned suggests misappropriation. Defendant admits that he kept three flash drives containing ten Océ documents after he left the company. (Brazeau Aff. ¶¶ 39-43; *see* Cooperman Aff., Exs. 46-55.) But he claims that he did so inadvertently, a claim the substance of the documents supports. Eight of the documents are Powerpoint presentations about goals plaintiff set for 2007 and 2008, seven of which relate solely to WFPS and none of which identifies current or potential customers, pricing strategies or profit margins for any of its products or services. (*See* Cooperman Aff., Exs. 47-54.) Likewise, the ninth document, which is entitled "Divisional Introductions," is dated October 9, 2007 and sets forth initial milestones for the cross-selling program, contains no customer-related, pricing or margin information. (*Id.*, Ex. 55.) The last document, entitled "Cross Divisional Selling Accounts," identifies seventeen PPS customers, twenty-five DPS customers and nine WFPS customers who were part of the cross-selling program and the InfoPrint representatives who had

9

responsibility for them. (*Id.*, Ex. 46.) The document is undated but, because it identifies General Dynamics and Textron as participants, DPS customers that were dropped from the program by July 28, 2008, it had to have been created before that date. (*See id.*; *id.*, Ex. 25, Cross Selling Program – WFPS Guest Rep Tracking Report at OCE0048280.) Given their age and content, it is not clear whether or how these documents would have helped InfoPrint in and after 2009. Consequently, they provide little, if any, basis for inferring that defendant misappropriated them.

Plaintiff says any evidentiary gap can be filled by an adverse inference from defendant's admitted failure to save all of his InfoPrint instant messages. Like Judge Cox, the Court disagrees. An adverse inference may be appropriate if defendant had a duty to preserve the instant messages, he breached that duty, the breach involved willfulness, bad faith or fault and plaintiff was harmed by defendant's actions. *Wells v. Berger, Newmark & Fenchel, P.C.,* No. 07 C 3061, 2008 WL 4365972, at *6 (N.D. Ill. Mar. 18, 2008). "A party has a duty to preserve evidence over which it had control and reasonably knew or could reasonably foresee was material to a potential legal action." *Id.* at *6. Defendant's failure to preserve the messages was willful or in bad faith if it was "intentional or in reckless disregard of [his] obligations." *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992) (emphasis omitted). Defendant was at "fault," if his actions were "objectively unreasonable." *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000). A "minor blunder . . . . mere mistake or slight error in judgment" does not constitute fault. *Id.*

There is no dispute that defendant used Same Time, InfoPrint's instant message system, in the course of his work and did not save those messages until well after this suit was filed. (Brazeau Supplemental Aff. ¶¶ 1-5.) Thus, the evidence shows that defendant had, and breached, a duty to preserve those messages.

10

The record does not, however, show that defendant acted with "willfulness, bad faith or fault." *Marrocco*, 966 F.2d at 224 (emphasis omitted). Defendant claims that he did not save his instant messages from the start of his employment with InfoPrint because he did not know that he had the option or ability to do so. (Brazeau Supplemental Aff. ¶¶ 3-5.) Until he learned otherwise during this suit, defendant says he assumed InfoPrint treated Same Time messages like emails, which are stored on its server. (*Id.*) Moreover, once he discovered that he could, and would have to, change the program's default settings to save his Same Time messages, defendant says he promptly did so. (*Id.*) Plaintiff has no evidence that indicates otherwise, *i.e.*, that defendant knew, or should have known, that Same Time messages were not automatically saved. It has not, therefore, proven that defendant's actions were intentional, reckless or unreasonable. *Long*, 213 F.3d at 987.

Even if there were evidence of defendant's culpability, an adverse inference would still be inappropriate because the record suggests the spoliation caused plaintiff little harm. The record shows that defendant produced 55,000 documents and the parties deposed nine witnesses, which yielded scant evidence of misappropriation (R&R at 22; 7/8/09 Hr'g Tr. at 134; Cooperman Aff., Exs. 1-9, Deps. of Sundberg, Harper, Chapius, Wagner, Roberts, Roche, Baboyian, Romero & Brazeau.) Given the circumstances, it would be unreasonable, as Judge Cox put it, to infer that the missing messages "contained the 'smoking gun' . . . evidence" of misappropriation. (R&R at 22.)

Alternatively, plaintiff argues that it proved misappropriation through the doctrine of inevitable disclosure discussed in *Pepsico*. The plaintiff in that case sued a former employee for trade secrets misappropriation. 54 F.3d at 1264-65. The district court, believing that defendant would inevitably use plaintiff's trade secrets in his new job, enjoined him from performing the job for six months. *Id.* at 1267. Defendant appealed, and the Seventh Circuit affirmed the injunction

11

and endorsed the lower court's use of the inevitable disclosure doctrine. *Id.* at 1269 ("[A] plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.").

Defendant argues that inevitable disclosure applies only to trade secrets claims, the claim at issue in *Pepsico*, while plaintiff argues that its logic extends to non-compete claims as well. The Court agrees with plaintiff that any value the doctrine may have for proving disclosure should be the same regardless of the claim for which disclosure must be proven. (*See id.* at 1268 & *Outsource*, 192 F.3d at 666 (stating that proof of disclosure is a required element of both ITSA and non-compete claims).) Whether the Illinois Supreme Court would agree is another question, but one the Court need not decide because the record in this case does not support a finding of inevitable disclosure.

The *Pepsico* court endorsed inevitable disclosure as it was defined in *Teradyne, Inc. v. Clear Communications Corp.*, 707 F. Supp. 353 (N.D. Ill. 1989) and *Amp Inc. v. Fleischhacker*, 823 F.2d 1199 (7th Cir. 1987). *Id.* at 1268-69. The *Teradyne* court dismissed a trade secrets claim because defendants' alleged acts, "working for Teradyne, knowing its business, leaving its business, hiring employees from Teradyne and entering the same field (though in a market not yet serviced by Teradyne)" did not support an inference of inevitable disclosure. 707 F. Supp. at 357; *see Pepsico*, 54 F.3d at 1268 (stating that the complaint in *Teradyne* "would have passed muster" if it had alleged that defendants said they "intended to use Teradyne's trade secrets or . . . disavowed their confidentiality agreements with Teradyne, or . . . that Clear could not operate without Teradyne's secrets"). The *Amp* court affirmed the denial of a trade secrets preliminary injunction because "the mere fact that a person assumed a similar position at a competitor does not, without more, make it 'inevitable that he will use or disclose . . . trade secret information.'" *Pepsico*, 54 F.3d at 1269

12

(quoting *Amp*, 823 F.2d at 1207). In short, *Teradyne, Amp* and *Pepsico* teach that inevitable disclosure is a viable, but exacting, method of proving misappropriation.

The evidence in this case falls short. The record shows that defendant worked as plaintiff's PPS Central Regional Sales Director from 1996 to 2001 and, in that position, had access to its customer contact, pricing and business strategy information for its PPS products. (Mot. Prelim. Inj., Sundberg Decl. ¶ 7; Brazeau Aff. ¶ 2.) In 2001, defendant left his job with plaintiff to work in a virtually identical position for IBM Printing Systems, InfoPrint's predecessor and a PPS competitor of plaintiff. (Brazeau Aff. ¶ 3; Mot. Prelim. Inj., Sundberg Decl. ¶ 7.) Defendant stayed at IBM through 2004 and testifies, without evidentiary contradiction, that he performed his duties there without disclosing any confidential information he had obtained during his prior employment with plaintiff. (Brazeau Aff. ¶¶ 3-4.)

In 2005, defendant left IBM to return to work for plaintiff as Vice President of Sales for its WFPS division. (*Id.* ¶ 5; Mot. Prelim Inj., Sundberg Decl. ¶ 8.) In this position, defendant had access to plaintiff's Oasis database, which houses confidential customer contact, pricing and sales cycle information, but he rarely consulted it. (*Id.* ¶¶ 13-15; Sundberg Aff., Ex. 5, Roberts Dep. at 20-21.) He was also part of the committee that implemented the cross-selling program, which gave him access to confidential information about forty-five, fifteen from each division, of plaintiff's 10,000-plus customers. (Brazeau Aff. ¶¶ 19-20, 24; Mot. Prelim. Inj., Roche Decl. ¶¶ 6-8, 14; Sundberg Aff, Ex. 6, Roche Dep. at 32, 46, 84.) But the cross-selling program occupied "at most 3%" of defendant's time and generated only $800,000.00 of plaintiff's $3.7 billion annual revenues. (Brazeau Aff. ¶¶ 21-22; Sundberg Aff., Ex. 6, Roche Dep. at 49-50; *see id.*, Ex. 34, Cross Divisional Introductions August 2008 Activity Summary at OCE0069739); http://www.oceusa.com (follow

"Corporate Information" hyperlink; then follow "About Océ" hyperlink; then follow "Who We Are" hyperlink). Further, defendant says, again without contradiction, that he did not use any of IBM's confidential information in his work for plaintiff. (*Id.* ¶ 9.)

In 2009, defendant resigned his WFPS position with plaintiff to become Senior Vice President and General Manager of the Americas at InfoPrint (Brazeau Aff. ¶¶ 32, 34; Brazeau Supplemental Aff. ¶ 1), but there is virtually no evidence that he has used or will use plaintiff's confidential information for his new employer.

In short, the record shows that defendant is able to work for competitors without divulging one company's confidential information to the other, had access to plaintiff's confidential information through a database he rarely used and a cross-selling program that occupied a fraction of defendant's time, involved a fraction of plaintiff's customers and generated a fraction of its revenues. Though there is some evidence that might suggest misappropriation, it is scant, circumstantial and dwarfed in probative value by evidence to the contrary. Thus, the inevitable disclosure doctrine would not help plaintiff, even if it applied to both his ITSA and non-competition claims.

Plaintiff also contests Judge Cox's finding that the non-competition agreement is unenforceable. Such agreements are enforceable only if "the restraints [they] impose[] . . . are reasonably necessary" to protect an employer's legitimate business interest. *Arpac Corp. v. Murray*, 589 N.E.2d 640, 649 (Ill. App. Ct. 1992). "[R]easonableness is measured by [an agreement's] hardship to the employee, its effect upon the general public, and the reasonableness of the time, territory, and activity restrictions." *Id.*

14

The agreement in this case bars defendant from "directly or indirectly becom[ing] associated with, through ownership, employment, self-employment, consultancy, contract or otherwise" any:

> person, corporation, or other entity which designs, develops, manufactures, markets, sells or services any product or service which is the same as or similar to products or services which the Company designed, developed, manufactured, marketed, sold or serviced within the last twelve (12) months prior to the end of Employee's employment with the Company, including, but not limited to, printing, copying, multifunctional and/or facsimile equipment and/or sales of related supplies . . . .

(First Am. Compl., Ex. B, 2007 Agreement ¶ 2.) The covenant is one-year in length and nation-wide in scope. (*Id.*)

As plaintiff points out, some courts have enforced nationwide covenants not to compete of similar duration. *See, e.g.*, *Gorman Pub. Co. v. Stillman*, 516 F. Supp. 98, 101-06 (N.D. Ill. 1980) (enforcing two-year covenant not to compete nationally); *Instrumentalist Co. v. Band, Inc.*, 480 N.E.2d 1273, 1281 (Ill. App. Ct. 1985) (same); *Donald McElroy, Inc. v. Delaney*, 389 N.E.2d 1300, 1304-07 (Ill. App. Ct. 1978) (enforcing three-year nationwide covenant). In these cases, however, the breadth of one restriction was tempered by the limitations of another. The covenant in *Instrumentalist*, for example, applied only to magazines that were "directed to or primarily used by band or orchestra directors, piano or organ teachers or junior or senior high school instrumental musicians," and excluded "'house organ[s]' or any magazine . . . distributed" for free. 480 N.E.2d at 1276. Similarly, the covenant in *Donald McElroy* only barred defendant from engaging in "purchasing activities" with any supplier defendant had contacted on plaintiff's behalf or who had actually supplied materials to plaintiff in the last year of defendant's employment. 389 N.E.2d at 1304. *See Gorman*, 516 F. Supp. at 104 (noting that the covenant applied only to a "limited number of jobs" and had not prevented defendant from obtaining work in his field); *see also Office Elecs., Inc. v. Grafic Forms, Inc.*, 372 N.E.2d 125, 127-28 (Ill. App. Ct. 1978) (enforcing a covenant that

15

applied only if defendant breached the parties' employment agreement and only to businesses that "compete[]with [plaintiff] within a 50 mile radius").

There is no tempering restriction in this agreement, which prohibits defendant from working for, consulting with or acquiring an interest in any firm, nationwide, that designs, makes, sells or services any product that is "the same as or similar to" products plaintiff designed, made, sold or serviced in the last year of defendant's employment. (First Am. Compl., Ex. B, 2007 Agreement ¶ 2(b).) This agreement is akin to the one in *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512 (Ill. App. Ct. 2007), which barred the defendant from "directly or indirectly, engag[ing] in any activity for or on behalf of Employer's competitors, or engage in any business that competes with Employer." *Id.* at 524. The court said the agreement's "blanket bar on all activities for competitors" was unenforceable. *Id.* at 525-26; *see Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 444 (Ill. App. Ct. 1997) ("Courts are hesitant to enforce prohibitions against employees servicing not only customers with whom they had direct contact, but also customers they never solicited or had contact with while employed by plaintiff." (citations omitted)). Because this agreement, like the one in *Cambridge Engineering*, bars defendant from working in any capacity for or with a company that competes with plaintiff in any segment of the copy equipment and services market nationwide, it is unenforceable.

Moreover, the Court agrees with Judge Cox that it would be improper to "blue pencil" this agreement. (R&R at 25-26.) Under Illinois law, the Court has discretion to "blue pencil" or modify an overly broad restrictive covenant. *Arpac*, 589 N.E.2d at 652. However, a court should not modify an agreement that is patently unfair or requires "drastic modifications" because doing so could "discourag[e] the narrow and precise draftsmanship which should be reflected in written

16

agreements." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 719 N.E.2d 1141, 1149 (Ill. App. Ct. 1999) (quotation omitted).

Such is the case here, as plaintiff's suggested modifications illustrate. (*Compare* Supplemental Mem. Law Supp. Mot. Prelim. Inj. at 12 ("Brazeau should at a minimum be prohibited from working for a Competing Business on a nationwide level where he is responsible for (a) profitability of the Competing Business; (b) increasing overall sales revenue; or (c) managing the sales organization."), *with* First Am, Compl., Ex. B, 2007 Agreement ¶ 2(a), (b) (setting forth the terms of the non-competition agreement).) The Court will not re-write this agreement to save plaintiff from the consequences of the one it drafted.

## Conclusion

For the reasons set forth above, the Court overrules both parties' objections to Magistrate Cox's R&R, adopts her recommendation and denies plaintiff's motion for a preliminary injunction [doc. no. 8].

**SO ORDERED.**                                             **ENTERED: March 18, 2010**

                                                                        _____
                                                                        **HON. RONALD A. GUZMAN**
                                                                        **United States District Judge**